UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GERALDINE WENGLE,

     Plaintiff,                      Case No. 14-cv-10644
                                         Hon. Matthew F. Leitman

v.

DIALAMERICA MARKETING, INC.

     Defendant.

_____/

## ORDER GRANTING DEFENDANT'S MOTION FOR  SUMMARY JUDGMENT (ECF #40)

The Telephone Consumer Protection Act, 47 U.S.C. § 227 *et. seq*., and its implementing regulations (collectively, the "TCPA") generally prohibit telemarketers from placing solicitation calls to consumers who have added their names to the National Do Not Call Registry.  But calls placed "on behalf of" a "tax-exempt nonprofit organization" are exempt from this prohibition. *See* 47 U.S.C. § 227(a)(4); 47 C.F.R. 64.1200(f)(14)(iii) (the "Nonprofit Exemption"). The question currently before the Court is whether calls placed by Defendant DialAmerica Marketing, Inc. ("DialAmerica") to Plaintiff Geraldine Wengle ("Wengle") fall within the Nonprofit Exemption.  DialAmerica argues that the calls are covered by the Nonprofit Exemption because it placed those calls on behalf of a tax exempt nonprofit organization, the Special Olympics of Michigan

1

("SOMI").   Wengle counters that the Nonprofit Exemption does not apply to DialAmerica's calls to her because DialAmerica placed the calls for its own commercial purposes.   The Court agrees with DialAmerica, and it therefore **GRANTS** DialAmerica's Motion for Summary Judgment (ECF #40).

<u>RELEVANT FACTUAL BACKGROUND</u>

**A.    The Parties**

Wengle is a resident of Dearborn, Michigan.   On May 14, 2010, she registered her home phone number with the National Do Not Call Registry in order to avoid calls from telemarketers.   (*See* Wengle Declaration, ECF #50 at 1, ¶2, Pg. ID 799; *see also* registration confirmation, ECF #50-2 at 1, Pg. ID 805.)

DialAmerica is a for-profit telemarketing company that frequently works as a professional fundraiser for charitable organizations.   In 2008, DialAmerica obtained a State of Michigan License to Solicit Charitable Contributions.   (*See* license, ECF #34-3 at 18, Pg. ID 535.)   The State has renewed this license each year from 2009 through 2015.   (*See* licenses, ECF #34-3 at 29-34, Pg. ID 546-551.)

SOMI is the authorized Michigan affiliate of the Special Olympics. (*See* Declaration of Lois Arnold, ECF #34-1 at 2, ¶2, Pg. ID 428.)   SOMI is a tax-exempt charitable organization that provides year-round sports training and athletic competition for children and adults with intellectual disabilities.   (*See id*. at 2, ¶¶ 2-

3, Pg. ID 428)  Lois Arnold ("Arnold") is SOMI's President and CEO.  (*See id.* at 1, ¶1, Pg. ID 427.)

SOMI raises funds to promote its charitable mission in many ways.  Its fundraising methods include special events, direct mail, corporate sponsorships, and business-to-business fundraising.  (*See id.* at 2, ¶4, Pg. ID 428)  SOMI also uses professional telemarketers to raise funds.  (*See id.* at 3, ¶5, Pg. ID 429)  Arnold says that professional telemarketing is a "potent fundraising method…[that] is critical to fulfilling SOMI's core mission because … it enables SOMI to raise funds without having to incur the risk of paying for fundraising expenses that might exceed the revenue generated by SOMI."  (*Id.*)

## B.   DialAmerica's Sponsor Fundraising Program and the Federal Communication Commission's Refusal to Exempt the Sponsor Program from the TCPA

In the early 2000s, DialAmerica implemented what was called the "Sponsor Program" through which it sold magazine subscriptions and donated a portion of the proceeds to charitable organizations.  The record does not contain a detailed description of the Sponsor Program, but DialAmerica offered the following explanation of the program to the Federal Communications Commission (the "FCC"):

> [T]hrough its Sponsor Program, DialAmerica contracts with magazine publishers to offer magazine subscriptions at heavily discounted rates, creating a catalog of over 400 magazines for sale.  It then works with a specific charity

3

> to conduct outreach and fundraising. DialAmerica makes telephone calls to consumers, during which they describe the particular charity, and ask consumers to subscribe to a magazine of their choice. Consumers are told that 12 $\frac{1}{2}$ percent of each sale will go to the charity. If a consumer buys a magazine subscription, the charity receives 12 $\frac{1}{2}$ percent of the subscription price. From the discounted subscription price, DialAmerica pays the magazine publisher an agreed upon amount. DialAmerica retains a portion of the subscription price to cover its costs.

20 FCC Rcd. 3788, 3799, n. 85 (2005).

In 2005, DialAmerica asked the FCC to rule that calls made pursuant to the Sponsor Program were covered by the Nonprofit Exemption. *See id.* at 3799, ¶29. As described in more detail below (*see* p. 14-15 *infra*), the FCC declined to grant DialAmerica its requested exemption.

## C.    DialAmerica Replaces the Sponsor Program

In 2006, DialAmerica replaced the Sponsor Program with a new magazine-sales fundraising program that the parties have referred to as the "Professional Fundraising Program." (*See, e.g.,* Wengle Response Brief, ECF #49 at 5, Pg. ID 776.) The Professional Fundraising Program differs from the Sponsor Program in many ways. For example, under the Professional Fundraising Program, if a consumer purchases a magazine, the resulting contractual and business relationship is between the consumer and the charity, not between the consumer and DialAmerica; indeed, the bill for the consumer's purchase is "sent out in the name of the charity," not in DialAmerica's name. (Deposition of DialAmerica Vice-

4

President Noreen Kaminski, ECF #51-3 at 25, Pg. ID 829.)  In addition, under the Sponsor Program consumers paid DialAmerica directly for the magazines they purchased and DialAmerica then donated a portion of those proceeds to charity, but under the Professional Fundraising Program, "[t]he monies go directly to the charity.   [The charities] have their own post office box and their own bank accounts."  (*Id*. at 24, Pg. ID 828.)  After the money is deposited into a charity's bank account, the money is then transferred to DialAmerica for processing – i.e., for payment of the subscription price to the magazine publisher and for payment of DialAmerica's fees and expenses. (*See id.* at 25-27, Pg. ID 829-831.)  DialAmerica then remits 12.5-percent of the funds collected from magazine sales back to the charity.   (*See id*.)   Moreover, under the Professional Fundraising Program DialAmerica collects "direct donations" from consumers who do not wish to purchase any magazines, and the charities receive 100-percent of those donations. (*See id.* at 24, Pg. ID 828.)   DialAmerica did not collect direct donations under the prior Sponsor Program. (*See id*.)

**D.   SOMI Engages DialAmerica to Raise Money on Terms that Give SOMI Substantial Control and That Incorporate the Financial Structure of the Professional Fundraising Program**

By written agreement dated July 23, 2008, SOMI engaged DialAmerica to conduct a magazine-sale fundraising campaign "on [SOMI's] behalf" (the "SOMI-DialAmerica Program").  (SOMI-DialAmerica contract, ECF #34-1 at 12-13, Pg.

ID 438-439.)  Under the SOMI-DialAmerica Program, SOMI retains considerable control over the solicitation process.  For example, SOMI has "the right, to approve in writing, in advance, each and every use of its name, trademark and logo, including without limitation, on any script or promotional and related materials regardless of medium." (*Id.* at 12, ¶1, Pg. ID 438.)  SOMI has exercised this control by reviewing and approving the fundraising script that DialAmerica uses during its calls with consumers. (*See* Arnold Decl., ECF #34-1 at 4, ¶¶ 10, 12, Pg. ID 430.)  In addition, "[t]he telemarketing script is consistently [revised and] tailored to include information received from SOMI to promote specific current events being conducted by SOMI." (*Id.* at 4, ¶12, Pg. ID 430.)

Moreover, under the SOMI-DialAmerica Program, SOMI, not DialAmerica, retains the "established business relationship" with each consumer who purchases a magazine subscription.  (SOMI-DialAmerica contract, ECF #34-1 at 13, ¶4, Pg. ID 439.)  Thus, "[w]hen a magazine sale is made, the customer is sent a SOMI invoice bearing SOMI's logo, identifying SOMI as the invoicing entity, and specifying that the invoiced amount is payable to SOMI and is to be sent to a Michigan Post Office Box in the same of SOMI."  (Arnold Decl., ECF #34-1 at 5, ¶13, Pg. ID 431; *see also* SOMI invoice, ECF #34-1 at 34, Pg. ID 460.)  The initial invoice also includes a "thank you" letter from Arnold, SOMI's President and CEO, that says, in part, "[t]he money raised from this program will go directly

6

toward our services for the athletes who represent the true spirit of [SOMI]." (Arnold Decl., ECF #34-1 at 5, ¶14, Pg. ID 431; *see also* SOMI invoice, ECF #34-1 at 34, Pg. ID 460; thank-you notes, ECF #34-1 at 36, Pg. ID 462.)

The SOMI-DialAmerica Program incorporates the financial structure of the Professional Fundraising Program. "SOMI [initially] receives 100% of each magazine sale and 100% of every direct donation made to support SOMI's cause." (Arnold Decl., ECF #34-1 at 6, ¶15; *see also* SOMI-DialAmerica contract, ECF #34-1 at 12, Pg. ID 438.) These funds are initially deposited into a bank account owned and controlled by SOMI – an account that SOMI established with JPMorgan Chase Bank[1] (*see* Arnold Decl., ECF #34-1 at 6, ¶16, Pg. ID 438; *see also* SOMI bank account records, ECF #34-1 at 39-52, Pg. ID 465-478) – and are then "forwarded to [DialAmerica's] headquarters for processing." (SOMI-DialAmerica contract, ECF #34-1 at 12, ¶3, Pg. ID 438.) Following processing, DialAmerica remits to SOMI 12 ½-percent of "every paid order … in addition to 100% of any direct donations [DialAmerica] receive[d] on [SOMI's] behalf." (*Id.*)

Between September 2008 and June 2014, DialAmerica made 28,267 magazines sales through the SOMI-DialAmerica Program and generated 1,191

---

[1] SOMI has authorized DialAmerica "to endorse checks made payable to SOMI for deposit into this account and transmit the checks for deposit to JPMorgan[,]" but "only SOMI [] own[s] and control[s] the account and any services provided by JPMorgan with regard to the account." (Correspondence, ECF #34-1 at 38, Pg. ID 464.)

direct donations to SOMI.  (*See* Arnold Decl., ECF #34-1 at 8, ¶23, Pg. ID 434.)
SOMI netted $734,208.58 from these sales and donations.  (*See id.*)  SOMI says
that DialAmerica's work on its behalf is "critical to fulfilling SOMI's charitable
mission" because it allows SOMI to avoid dependence on "traditional, more costly
fundraising methods."  (*Id.* at 8-9, ¶24, Pg. ID 434-435)  SOMI also maintains that
"DialAmerica's fundraising on behalf of SOMI is critical for [] another reason:
every contact that DialAmerica makes on behalf of SOMI results in increased
awareness of SOMI's mission." (*Id.* at 9, ¶25, Pg. ID 435.)

### E.   Wengle Says She Received Unwanted Phone Calls From DialAmerica

Wengle claims that she received 23 phone calls from DialAmerica between
October 2009 and March 2012, and that at least one of these calls used a
prerecorded message.  (*See* Wengle Response Brief, ECF #49 at 7-8, Pg. ID 782-
783.)  Wengle maintains that that the calls she received "from DialAmerica were
for or from [SOMI]."  (Wengle Dep., ECF #34-2 at 25, Pg. ID 504.)  DialAmerica,
on the other hand, insists that Wengle only received two of its calls and that those
calls were more than a year apart.  (Decl. of DialAmerica Vice President of
Telecommunications and Fulfillment David Aboussleman, ECF #34-4 at 2-4, ¶¶ 4-
10, Pg. ID 556-558.)

## GOVERNING LEGAL STANDARD

A movant is entitled to summary judgment when it "shows that there is no genuine dispute as to any material fact...." *U.S. SEC v. Sierra Brokerage Services, Inc.,* 712 F.3d 321, 326–27 (6th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52 (1986)) (quotations omitted).  When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.*  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." *Anderson,* 477 U.S. at 252.  Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury."  *Id.* at 251-252.  Indeed, "[c]redibility determinations, the weighing of the evidence, and the drafting of legitimate inferences from the facts are jury functions, not those of a judge…" *Id.* at 255.

## ANALYSIS

**A.    The TCPA and the Nonprofit Exemption**

Congress enacted the TCPA in response to consumer "outrage[] over the proliferation of intrusive, nuisance telemarketing calls to their homes."  *Mims v. Arrow Financial Services, LLC*, 132 S.Ct. 740, 745 (2012).  The TCPA required the FCC to "initiate a rulemaking proceeding concerning the need to protect

9

residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1). Congress later passed the Do-Not-Call Act, 15 U.S.C. § 6101 *et seq.*, which authorized the establishment of a national, centralized do-not-call registry.

On September 18, 2002, following these directives from Congress, the FCC "released a Memorandum Opinion and Order and Notice of Proposed Rulemaking seeking comment on whether the Commission's rules need to be revised in order to carry out more effectively Congress's directives in the TCPA." 18 FCC Rcd. 14014, 14018, ¶14 (2003). Among other things, the FCC asked for public comment on whether it needed to "revise or clarify [its] rules governing unwanted telephone solicitations," and whether it should establish a national do-not-call registry. *Id.* On June 26, 2003, the FCC adopted new rules that implemented the National Do Not Call Registry[2] and placed new restrictions on telemarketers (the

---

[2] Before the FCC created the National Do Not Call Registry, there were various "do not call" lists in existence, including lists maintained by various states and the Federal Trade Commission (the "FTC"). *See* 18 FCC Rcd. at 14023-14026, ¶¶ 9-13. But the FCC believed that "consistency in the underlying regulations and administration of the national do-not-call registry [was] essential to avoid consumer confusion and regulatory uncertainty in the telemarketing industry." *Id.* at 14034, ¶26. Thus, through its rulemaking proceeding, the FCC created "one centralized national do-not-call database" that included the "telephone numbers of residential subscribers who object to receiving telephone solicitations." *Id.* at 14033-14034, ¶¶25, 27. This centralized database is maintained by the FTC. *See id.*

"2003 FCC Order"). *See* 18 FCC Rcd. 14014. The FCC released these rules to the public on July 3, 2003. (*See id.*)

The FCC also adopted regulations implementing these rules. The regulations relevant to Wengle's claims provide that "[n]o person or entity shall initiate any telephone solicitation to… [a] residential telephone subscriber who has registered his or her telephone number on the [Do Not Call Registry]." 47 CFR § 64.1200(c)(2). A "telephone solicitation" is defined both in the TCPA and in its implementing regulations as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." 47 U.S.C. § 227(a)(4); *see also* 47 CFR § 64.1200(f)(14) (same). However, as noted above, under the TCPA's Nonprofit Exemption, a call placed "[b]y or on behalf of a tax-exempt nonprofit organization" is *not* a "telephone solicitation." *Id.*

The TCPA creates a private right of action for any person who "has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of" the implementing regulations adopted by the FCC. 47 U.S.C. § 227(c)(5).

## B. The Relevant Authorities Construing the Nonprofit Exemption

It does not appear that any court has considered whether a telephone solicitation made pursuant to a program like the SOMI-DialAmerica Program

11

qualifies for the Nonprofit Exemption. Nor does it appear that the FCC has considered this specific issue. The most relevant authorities are three FCC rulings – two orders touching on the Nonprofit Exemption and one declaratory ruling interpreting the phrase "on behalf of" as used in the TCPA. The Court has also located two unpublished court decisions that address the Nonprofit Exemption, albeit without substantial analysis.

### 1.    The FCC Rulings Addressing the Nonprofit Exemption

#### a.    The 2003 FCC Order

In the 2003 FCC Order that established the National Do Not Call Registry, the FCC also addressed the scope of the Nonprofit Exemption. *See* 18 FCC Rcd. at 14087-14090. In the 2003 FCC Order, the FCC noted that it had received inquiries about "calls made jointly by nonprofit and for-profit organizations" and that it had requested public comments concerning the scope of the Nonprofit Exemption. *Id.* at 14087-14088, ¶126. In response to the FCC's request, certain "[t]ax-exempt organizations explained that they rely on the expertise and operational efficiencies of professional fundraisers to conduct their fundraising campaigns. Therefore, they support[ed] the continued [Nonprofit] [E]xemption for professional fundraisers that call on behalf of nonprofit organizations." *Id.* at 14088, ¶127. In contrast, other groups, such as the National Association of Attorneys General, complained that the Nonprofit Exemption "frequently has been used to veil what is

12

in reality a commercial venture." *Id.* These groups argued that calls that benefit for-profit companies (even in part) should not be considered calls "on behalf of" a charitable organization and should not be protected by the Nonprofit Exemption. *Id.*

DialAmerica also filed a public comment in response to the FCC's request. It asked the FCC to expand the Nonprofit Exemption for calls like those made under its Sponsor Program (under which it sold magazines to consumers and then donated 12.5-percent of the proceeds to a charitable nonprofit). DialAmerica "urged the [FCC] to confirm that the [Nonprofit] [E]xemption also applies when for-profits call, conduct a commercial transaction, and donate a percentage of the proceeds to nonprofit charitable organizations." *Id.*

After considering the comments, the FCC confirmed that "*calls made by a for-profit telemarketer hired to solicit the purchase of goods or services or donations on behalf of a tax-exempt nonprofit organization are exempted from the rules on telephone solicitation.*" *Id.* at 14089, ¶128 (emphasis added). The FCC then recognized the critical support that for-profit fundraisers provide to nonprofit entities and explained that the TCPA was not intended to prevent for-profit fundraisers from making calls on behalf of nonprofits:

> In crafting the TCPA, Congress sought primarily to protect telephone subscribers from unrestricted commercial telemarketing activities, finding that most unwanted telephone solicitations are commercial in

13

> nature.  In light of the record before us, the Commission believes that there has been no change in circumstances that warrant distinguishing those calls made by a professional telemarketer on behalf of a tax-exempt nonprofit organization from those made by the tax-exempt nonprofit itself.  The Commission recognizes that charitable and other nonprofit entities with limited expertise, resources and infrastructure, might find it advantageous to contract out its fundraising efforts. Consistent with section 227, a tax-exempt nonprofit organization that conducts its own fundraising campaign or hires a professional fundraiser to do it, will not be subject to the restrictions on telephone solicitations.

*Id.*

However, the FCC specifically rejected DialAmerica's position that calls made pursuant to fundraising programs like the Sponsor Program qualify for the Nonprofit Exemption:

> If, however, a for-profit organization is delivering its own commercial message as part of a telemarketing campaign (*i.e.*, encouraging the purchase or rental of, or investment in, property, goods, or services), even if accompanied by a donation to a charitable organization or referral to a tax-exempt nonprofit organization, that call is not by or on behalf of a tax-exempt nonprofit organization. Such calls, whether made by a live telemarketer or using a prerecorded message, would not be entitled to exempt treatment under the TCPA. [....] [A] seller that calls to advertise a product and states that a portion of the proceeds will go to a charitable cause or to help find missing children must still comply with the TCPA rules on commercial calls.

*Id.* at 14089-14090, ¶128.

14

### b.    The 2005 FCC Order

In 2005, the FCC issued an order in which it "address[ed] certain issues raised in petitions for reconsideration of [the 2003 FCC Order]" (the "2005 FCC Order").   20 FCC Rcd. 3788, ¶1 (2005).   One such petition came from DialAmerica.  DialAmerica asked the FCC to reconsider the portion of the 2003 FCC Order in which the FCC held that the Nonprofit Exemption did not apply to calls made under the Sponsor Program.  *See id.* at 3799, ¶¶ 28-29.  Specifically, DialAmerica requested that the FCC "clarify that [DialAmerica's] 'Sponsor Program' is exempt from the [National Do Not Call Registry] because the calls [DialAmerica] makes are on behalf of a tax-exempt nonprofit entity, and not on behalf of a for-profit seller."  *Id.* at 3799, ¶29.

The FCC declined DialAmerica's request. The FCC first "reaffirm[ed its earlier] determination" that the Nonprofit Exemption does not apply to "for-profit companies that call to encourage the purchase of goods or services, yet donate some of the proceeds to a nonprofit organization."  *Id.* at 3799-3800, ¶30.  Then the FCC specifically declined to exempt DialAmerica's Sponsor Program from the requirements of the National Do Not Call Registry:

> In circumstances where telephone calls are initiated by a for-profit entity to offer its own, or another for-profit entity's products for sale – even if a tax-exempt nonprofit will receive a portion of the sale's proceeds – such calls are telephone solicitations as defined by the TCPA. We distinguish these types of calls from those initiated,

15

> directed and controlled by a tax-exempt nonprofit for its own fundraising purposes. We believe that to exempt for-profit organizations merely because a tax-exempt nonprofit organization is involved in the telemarketing program would undermine the purpose of the do-not-call registry. Thus, we decline to exempt DialAmerica's Sponsor Program from the [National Do Not Call Registry].

*Id.*[3]

### c.      The DISH Network Declaratory Ruling

In 2013, the FCC issued a declaratory ruling that "address[ed] three petitions…raising issues concerning [the TCPA] that [] [arose] in two [] federal court lawsuits" involving DISH Network (the "DISH Network Ruling"). *See* 28 FCC Rcd. 6574 (2013). The petitions asked the FCC to determine, among other things, whether "a seller [would be] liable under the TCPA for unlawful telemarketing calls that are sent by third parties 'on behalf of' or 'for the benefit of' the seller." *Id.* In order to review that question, the FCC had to interpret the term "on behalf of" – the same phrase that is at issue in this action.

The FCC first explained that "federal statutory tort actions, such as those authorized under the TCPA, typically are construed to incorporate federal common law agency principles of vicarious liability where, as here, the language of the

---

[3] The FCC has never reviewed whether the Nonprofit Exemption applies to the Professional Fundraising Program or the SOMI-DialAmerica Program. The Court asked the parties whether it should refer this action to the FCC so it could issue such an opinion or declaratory ruling (*see* ECF #52), and both parties were opposed to the proposed referral (*see* ECF ## 55, 56).

16

statute permits such a construction and doing so would advance statutory purposes." *Id.* at 6584, ¶29. The FCC then concluded that "[c]onsistent with this precedent…section 227(c)(5) [of the TCPA] contemplates, at a minimum, the application of such principles of vicarious seller liability for do-not-call violations." *Id.* The FCC also noted that "[s]tandard dictionary definitions of the phrase 'on behalf of' include, among other things, 'in the interest of,' 'as a representative of,' and 'for the benefit of'— concepts that easily can be read to encompass common law agency principles." *Id.* at 6585, ¶30. Thus, the FCC concluded that the phrase "on behalf of" incorporates "a broad range of agency principles, including not only formal agency, but also principles of apparent authority and ratification." *Id.* at 6584, ¶28.

### 2.  The Unpublished Decisions Applying the Nonprofit Exemption

The Court has found two only two decisions – both unpublished – addressing the Nonprofit Exemption: *Fitzhenry v. Independent Order of Foresters*, 2015 WL 3711287 (D.S.C. June 15, 2015) and *Charvat v. Teleytics, LLC*, 2006 WL 2574019 (Ohio App. 10 Dist. Aug. 31, 2006). In both cases, the courts held that the calls in question did fall within the Nonprofit Exemption. In *Fitzhenry*, a for-profit company placed calls in an effort to sell insurance offered by a nonprofit entity, and in *Charvat*, a for-profit company placed calls in an attempt to sell credit counseling services offered by a nonprofit entity. In both cases, the courts held

17

that a call placed by a for-profit entity offering goods or services to be furnished by a nonprofit entity falls squarely within the Nonprofit Exemption. *See Fitzhenry*, 2015 WL 3711287, at ** 2-4; *Charvat*, 2006 WL 2574019, at ** 3-5.

## C. Calls Made by DialAmerica Pursuant to the SOMI-DialAmerica Program Fall Within the Nonprofit Exemption

As described in detail above, "calls made by independent telemarketers on behalf of tax-exempt nonprofits [] are not subject to the rules governing telephone solicitations" in the TCPA. 18 FCC Rcd. at 14087, ¶125. And a call is placed "on behalf of" a tax-exempt nonprofit when it is placed "for the benefit of" or "in the interest of" the nonprofit, concepts that "encompass common law agency principles." 28 FCC Rcd. at 6585, ¶30.

Here, DialAmerica acts for SOMI's benefit, in SOMI's interest, and as SOMI's common-law agent. Thus, DialAmerica calls "on behalf of" SOMI when it makes telephone solicitations pursuant to the SOMI-DialAmerica Program. Its phone calls to Wengle therefore qualify for the Nonprofit Exemption.

Substantial undisputed evidence in the record compels this conclusion. First, the parties' contract expressly provides that SOMI has engaged DialAmerica to sell magazines "on [SOMI's] behalf." (SOMI-DialAmerica contract, ECF #34-1 at 12, Pg. ID 438.) Moreover, Arnold, SOMI's President and CEO, confirms that SOMI "utilize[s] DialAmerica to perform telemarketing fundraising services *on behalf of* SOMI" and that these services are "critical to fulfilling SOMI's charitable

18

mission." (Arnold Decl., ECF #34-1 at 3, 8-9, ¶¶6, 24, Pg. ID 429, 434; emphasis added). And DialAmerica begins every call by explaining that it is a professional fundraiser calling "for" SOMI. (*Id.* at 4, ¶11, Pg. ID 430; *see also* SOMI-DialAmerica script, ECF #34-1 at 15, Pg. ID 441.)

Second, under the SOMI-DialAmerica Program, SOMI has the right to assert control over, and has asserted control over, the content of the telemarketing script DialAmerica uses. (Arnold Decl., ECF #34-1 at 4, ¶¶ 9-12, Pg. ID 430.) Indeed, "[t]he telemarketing script is consistently tailored to include information received from SOMI to promote specific current events being conducted by SOMI. This ensures that the script used on behalf of SOMI is both topical and timely to the customer." (*Id.* at 4, ¶12, Pg. ID 430.)

Third, when a customer purchases a magazine, the customer receives an invoice from SOMI – *not* DialAmerica – and receives letters of appreciation from SOMI. (*Id.* at 5, ¶¶ 13-14, Pg. ID 431; *see also* SOMI invoice, ECF #34-1 at 34, Pg. ID 460.) The invoice and thank-you letter direct customers to make their payments "payable to [SOMI]" and state that the customers' "support of [SOMI] is truly appreciated." (SOMI invoice, ECF #34-1 at 34, Pg. ID 460.) Thus, when a DialAmerica solicitation call is successful, it results in a business and contractual relationship *between the customer and SOMI,* not between the customer and DialAmerica. (*See id.*) Indeed, Arnold confirmed that "SOMI – not DialAmerica

19

– maintains the Established Business Relationship with [each] customer." (Arnold Decl. at 5, ¶13 Pg. ID 431.)

Fourth, when a customer pays SOMI directly, the funds are deposited into a SOMI-controlled bank account. (*See id.* at 5, ¶16, Pg. ID 432.) "Only SOMI [] own[s] and control[s] the account and any services provided…with regard to the account." (Correspondence, ECF #34-1 at 38, Pg. ID 464; *see also* SOMI bank account records, ECF #34-1 at 39-52, Pg. ID 465-478)

Finally, in addition to selling magazines on SOMI's behalf, the SOMI-DialAmerica Program allows DialAmerica to collect direct donations for SOMI from the consumers it calls.[4] (*See* Arnold Decl. at 3, ¶8, Pg. ID 429.) As with each payment for magazine subscription, every direct donation DialAmerica collects for SOMI is deposited directly into SOMI's bank account. (*See id.* at 6, ¶18, Pg. ID 432.) SOMI then retains "100% of all [direct] donations generated as a result of [DialAmerica's] telemarketing calls." (*Id.* at 3, ¶8, Pg. ID 429.) Since the SOMI-DialAmerica Program began in 2008, DialAmerica has collected – and

---

[4] The script DialAmerica uses in its solicitation calls admittedly instructs its operators to begin each call by informing customers that DialAmerica is "not calling for a donation." (SOMI-DialAmerica script, ECF #34-1 at 15, Pg. ID 441.) However, if, after hearing about SOMI's mission and upcoming events, a customer wants to make a direct donation to SOMI instead of purchasing a magazine subscription, the script allows for such a direct donation to be made. (*See id.* at 19, Pg. ID 445.) The script further allows for a DialAmerica operator to provide a customer SOMI's address so the customer can "make a direct donation at another time." (*Id.*)

SOMI has received – 1,191 direct donations totaling nearly $100,000 in revenue for SOMI.  (*Id.* at 8, ¶23, Pg. ID 434.)

These undisputed facts demonstrate that DialAmerica's calls under the SOMI-DialAmerica Program are placed "on behalf of" SOMI and thus fall within the Nonprofit Exemption.  Indeed, the FCC has confirmed that calls like these – "calls made by a for-profit telemarketer hired to solicit the purchase of goods or services or donations on behalf of a tax-exempt non-profit organization" – fit comfortably within the exemption. *See* 18 FCC Rcd. at 14089.  Thus, DialAmerica's alleged calls to Wengle are not actionable under the TCPA.

Wengle resists this conclusion on several grounds.  She first argues that the SOMI-DialAmerica Program is no different from DialAmerica's prior Sponsor Program – which, according to the FCC, did not qualify for the Nonprofit Exemption.  She then insists that because the Sponsor Program did not qualify for the Nonprofit Exemption, the SOMI-DialAmerica Program must likewise fall outside the exemption.  But, as described in detail above, the SOMI-DialAmerica Program is materially different from the Sponsor Program.  Unlike the Sponsor Program, the SOMI-DialAmerica Program (1) gives the nonprofit entity substantial control over the content of the message (*see, e.g.,* SOMI-DialAmerica contract, ECF #34-1 at 12, Pg. ID 438), (2) results in a business and contractual relationship between the consumer and the nonprofit, not the consumer and DialAmerica (*see,*

21

*e.g.,* SOMI invoice, ECF #34-1 at 34, Pg. ID 460), (3) involves a payment directly to the nonprofit  (*see id.*), and (4) allows for direct donations to the nonprofit (*see, e.g.,* Arnold Decl., ECF #34-1 at 3, 6, ¶¶ 8, 18, Pg. ID 429, 432).  Thus, the FCC's conclusion that the Sponsor Program falls outside the Nonprofit Exemption does not mean that the SOMI-DialAmerica Program also lies outside the exemption.

Wengle next directs the Court to the FCC's statement in the 2005 FCC Order that the Nonprofit Exemption applies to calls that are "initiated, directed and controlled by a tax-exempt nonprofit for its own fundraising purposes," *see* 20 FCC Rcd. at 3800, ¶30, and she argues that DialAmerica's calls made under the SOMI-DialAmerica Program do not qualify for the Nonprofit Exemption because SOMI neither initiates nor has control over the calls.  But the undisputed evidence establishes otherwise.  As set forth in detail above, SOMI specifically engaged DialAmerica to "initiate" fundraising calls on its behalf.  (*See* SOMI-DialAmerica contract, ECF #34-1 at 12-13, Pg. ID 438-439), and SOMI *does* retain substantial control over the message DialAmerica delivers (*see* Arnold Decl., ECF #34-1 at 4, ¶¶ 10, 12, Pg. ID 430).   Thus, DialAmerica's calls qualify for the Nonprofit Exemption even under the language Wengle relies upon.

Finally, Wengle insists that DialAmerica's calls made under the SOMI-DialAmerica Program do not qualify for the Nonprofit Exemption because DialAmerica uses those calls to deliver "its own commercial message." *See* 18

22

FCC Rcd. at 14089, ¶128.  But as the court in *Fitzhenry* aptly observed, the Nonprofit Exemption "contains no language of limitation indicating that it is only applicable to non-commercial calls.  It does not distinguish between calls made on behalf of nonprofits based on the substance of the call." *Fitzhenry*, 2015 WL 3711287 , at *3.

In any event, the telemarketing script used by DialAmerica for the SOMI-DialAmerica Program shows that DialAmerica was *not* delivering its "own commercial message."  The script begins by highlighting that the purpose of the call is to generate funds for SOMI. (*See* SOMI-DialAmerica script, ECF #34-1 at 15, Pg. ID 441.)  DialAmerica then describes SOMI's mission, extolls SOMI's good works, and stresses SOMI's financial needs. (*See id.*)  It also highlights upcoming SOMI events with information SOMI provides.  (*See id.*)  Notably, Arnold, SOMI's President and CEO, explains that the message DialAmerica delivers "is critical" to SOMI because it "results in increased awareness of SOMI's mission," "increase[s] public awareness of SOMI," and "help[s] to increase participation in SOMI by families who were not previously aware of SOMI programs available in their area." (Arnold Decl., ECF #34-1 at 9, ¶25, Pg. ID 435.) Arnold also insists that SOMI "benefits by having DialAmerica talk up SOMI's charitable mission and positively promote SOMI's public image."  (*Id.*)  Arnold says the result of such promotion by DialAmerica is that even those "who may

23

choose not to purchase a magazine, [may] make [a] direct financial contribution[], or, as a result of [DialAmerica's phone call], [may] offer to volunteer their time to SOMI." (*Id.*)   Because so much of the content of DialAmerica's calls to consumers is provided by and is about SOMI, DialAmerica is not delivering its "own commercial message" when it solicits customers on DialAmerica's behalf.

### D.   Wengle's Motion to Compel Discovery

On May 22, 2015, Wengle filed a motion to compel discovery from DialAmerica (the "Motion to Compel").   (*See* ECF #31.)   Among other things, Wengle seeks to compel the production of documents and information from DialAmerica related to the Nonprofit Exemption, such as communications DialAmerica may have had with the FCC with respect to Sponsor Program, the Professional Fundraising Program, and the SOMI-DialAmerica Program.   (*See, e.g.*, ECF #31-3 at Request for Production 7, Pg. ID 295.)   Wengle contends such information and documents could provide the Court insight into the legal issues currently before the Court.

The Court held a lengthy on-the-record status conference with counsel for Wengle and DialAmerica on September 11, 2015, to discuss Wengle's outstanding discovery requests that relate to the Nonprofit Exemption. (*See* ECF #57.)   During this conference, counsel for DialAmerica confirmed that DialAmerica has produced all documents and information in its possession that are relevant to the

24

legal issues now before the Court in DialAmerica's current summary judgment motion. Accordingly, following the on-the-record conference and based on counsel's representations to the Court, the Court is satisfied that there are no additional documents in DialAmerica's possession that relate to the issues before the Court. The pending Motion to Compel is therefore no bar to the Court ruling on and granting DialAmerica's summary judgment motion.

## CONCLUSION

For all of the reasons stated above, **IT IS HEREBY ORDERED** that DialAmerica's Motion for Summary Judgment (ECF #40) is **GRANTED**.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated:  September 22, 2015

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on September 22, 2015, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(313) 234-5113

25